## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| IN RE: CATTLE AND BEEF ANTITRUST LITIGATION | Case No. 22-3031 (JRT/JFD) Civil No. 22-2903 (JRT/JFD) |
| This Document Relates To: SPECHT PLAINTIFFS | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE *SPECHT* COMPLAINT** |

---

Rick Paul, **PAUL LLP**, 601 Walnut Street, Suite 300, Kansas City, MO 64106; and Michael Montaño**, WATTS GUERRA LLC,** 4 Dominion Drive, Building 3, Suite 100, San Antonio, TX 78257, for Plaintiffs.

Kosta S. Stojilkovik, **WILKINSON STEKLOFF LLP**, 2001 M Street Northwest, Tenth Floor, Washington, DC 20036; Jon B. Jacobs, **PERKINS COIE LLP,** 700 Thirteenth Street Northwest, Suite 800, Washington, DC 20005; Michelle Fischer, **JONES DAY**, 901 Lakeside Avenue, North Point, Cleveland, OH 44114; and Donald G. Heeman, **SPENCER FANE**, 100 South Fifth Street, Suite 2500, Minneapolis, MN 55402, for Defendants.

The putative *Specht* Class ("Plaintiffs") represents cow-calf ranchers who indirectly sell cows and calves to one or more Defendants in this action. They were recently transferred to the District of Minnesota to join this multidistrict litigation pertaining to alleged price-fixing in the beef packing industry. Defendants Cargill, Inc.; Cargill Meat Solutions Corporation; JBS Packerland, Inc.; JBS S.A.; JBS USA Food Company; National Beef Packing Company, LLC; Swift Beef Company; Tyson Foods, Inc.; and Tyson Fresh Meats, Inc. (collectively, "Defendants") moved to dismiss Plaintiffs' Complaint.

Because Plaintiffs failed to establish antitrust standing under *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983), the Court will dismiss their Sherman Act claim, their Packers and Stockyards Act claim, and many of their state antitrust and consumer protection claims. The Court will also dismiss their remaining state law claims as outlined below. Plaintiffs have not yet made a showing that they can correct the deficiencies in their complaint, so the Court declines to grant their request for leave to amend at this time. The Court will permit Plaintiffs to file a letter with the Court outlining how they intend to amend their Complaint to cure the deficiencies, which the Court will then consider.

## BACKGROUND

### I.   FACTS

Plaintiffs' factual allegations largely mirror that of the other Class Plaintiffs in this case, which the Court will not reiterate in detail again here. *See In re Cattle Antitrust Litig.*, No. 19-1222, 2021 WL 7757881, at *1–2 (D. Minn. Sept. 14, 2021). Plaintiffs assert that Defendants conspired to suppress the price of fed cattle they bought in the United States beginning no later than January 2015. (No. 22-2903, Class Action Compl. ("Compl.") ¶ 2, Oct. 31, 2022, Docket No. 1.)[1] Plaintiffs allege that Defendants'

---

[1] Unless otherwise noted, all docket citations are to Case No. 22-3031.

coordinated conduct caused a collapse in fed cattle prices in 2015, which in turn caused the prices of cows and calves to collapse.  (*Id.*)

Plaintiffs are cow-calf ranchers who indirectly sold cows and calves to Defendants.[2] (*Id.* ¶ 1.)  Cow-calf operations are the first step in the beef supply chain.  (*Id.* ¶ 59.)  Cow-calf ranchers maintain a herd of mature cattle that produce calves each year for sale in the beef market.  (*Id.*)  As the following diagram illustrates, Plaintiffs are at the beginning of beef production.  (*Id.* ¶ 5.)  Plaintiffs retain the cattle for the gestation period and then raise the calves until they are weaned from their mothers, which usually occurs when they reach 500 pounds.  (*Id.*)

---

[2] In their opposition to Defendants' motion to dismiss, Plaintiffs now assert that they represent all indirect sellers who raised cows and calves, which may also include stockers.  (Mem. Opp. Mot. Dismiss at 2, Mar. 20, 2023, Docket No. 178.)  However, that is not reflected in their Complaint, so the Court will construe Plaintiffs to only represent cow-calf ranchers.  (*See* Compl. ¶ 1.)



After the cattle are weaned from their mothers, cow-calf operators like Plaintiffs typically sell their cattle at private treaty sales or at auctions.  (*Id.* ¶ 60.)  While auctions are public proceedings, private treaty sales are—as the name implies—private.  (*Id.* ¶¶ 60–62.)  Only the buyer and the seller know the terms of their agreement in a private treaty sale.  (*Id.* ¶ 62.)

Cow-calf operators usually sell the cattle directly to a feedlot or, if the cattle are too small or light to enter the feedlot, to a stocker.  (*Id.* ¶ 63.)  Stockers will continue to feed the cows until they reach optimal weight for the feedlots.  (*Id.* ¶ 5.)  Feedlots are the final phase of the beef production system.  (*Id.* ¶ 64.)  Once the cattle reach between 950 and 1,500 pounds, they are sold to packers like Defendants.  (*Id.* ¶ 65.)  Each Defendant

in this action uses captive supply agreements to make the bulk of its purchases, which means that beef producers commit to delivering cattle to a packer once they have obtained slaughter-weight at a price to be determined pursuant to an agreed-upon formula. (*Id.* ¶¶ 77, 79.) The entire cattle production cycle from birth to slaughter is typically 15 to 24 months. (*Id.* ¶ 67.)

Plaintiffs assert that the Defendants used their market power, price sensitivities, and the "thin cash cattle trade" to depress cattle prices, which then caused the cow-calf market to decline. (*Id.* ¶ 9.) The price of cattle increased consistently from 2009 through 2014. (*Id.* ¶ 84.) However, the price allegedly collapsed dramatically in 2015, then stabilized below the prior trend line. (*Id.* ¶ 241.)

Similar to other parties in this action, Plaintiffs allege that Defendants implemented their buying cartel by agreeing to (1) reduce slaughter volume; (2) limit their purchases of cash cattle; (3) coordinate buying practices of cash cattle; (4) import foreign cattle to depress demand for cheaper domestic cattle; and (5) close or idle slaughter plants and refrain from expanding their slaughter capacity. (*Id.* ¶ 86.)

## II.   PROCEDURAL HISTORY

Plaintiffs James Specht, Jerry Kelsey, and Tad Larson own and operate farms that raise and sell cattle at auctions and barn sales. (*Id.* ¶¶ 27–29.) They initiated this action on behalf of themselves and all others similarly situated in the District of Kansas against Defendants Tyson Foods, Inc.; Tyson Fresh Meats, Inc.; JBS S.A.; JBS USA Food Company; Swift Beef Company; JBS Packerland, Inc.; Cargill, Inc.; Cargill Meat Solutions Corporation;

Marfrig Global Foods S.A.;[3] and National Beef Packing Company, LLC. (*See generally* Compl.) Plaintiffs bring nationwide claims based on market allocation and price-fixing in violation of the Sherman Act (Count I), Kansas Restraint of Trade Act (Count II), and the Packers and Stockyards Act ("PSA") (Count III). (*Id.* at 161–166.) Plaintiffs also bring state law claims based on violation of antitrust laws (Count IV) and consumer protection laws (Count V). (*Id.* at 166–171.) The Judicial Panel on Multidistrict Litigation transferred the case to the District of Minnesota on November 15, 2022. (No. 22-2903, Conditional Transfer Order, Nov. 15, 2022, Docket No. 4.)

Defendants have moved to dismiss Plaintiffs' Complaint. (Joint Mot. Dismiss, Feb. 3, 2023, Docket No. 140.) The Court has already considered multiple motions to dismiss in this action. *See In re Cattle Antitrust Litig.*, 2021 WL 7757881, at *18–19 (denying Defendants' motion to dismiss); *In re Cattle Antitrust Litig.*, No. 19-1222, 2020 WL 5884676, at *8 (D. Minn. Sept. 29, 2020) (granting Defendant' motion to dismiss and granting Class Plaintiffs leave to amend). Accordingly, the Defendants limited their arguments in this present motion to issues unique to these specific Plaintiffs. Plaintiffs oppose Defendants' motion to dismiss. (Pls.' Mem. Opp. Mot. Dismiss, Mar. 20, 2023, Docket No. 178.)

---

[3] Plaintiffs have since voluntarily dismissed Defendant Marfrig Global Foods S.A. pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). (No. 22-2903, Pl.'s Notice of Dismissal, Nov. 2, 2022, Docket No. 3.)

**DISCUSSION**

**I.   STANDARD OF REVIEW**

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). At the motion to dismiss stage, the Court may consider the allegations in the complaint as well as "those materials that are necessarily embraced by the pleadings." *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Court construes the complaint in the light most favorable to the plaintiff, drawing all inferences in the plaintiff's favor. *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). Although the Court accepts the complaint's factual allegations as true and construes the complaint in a light most favorable to the plaintiff, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). In other words, a complaint "does not need detailed factual allegations" but must include more "than labels and conclusions, and a formulaic recitation of the elements" to meet the plausibility standard. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## II.     ANALYSIS

Defendants present three main arguments: (1) that Plaintiffs have not adequately pled antitrust standing and causation under *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"); (2) that the nationwide damages claim under the Kansas Restraint of Trade Act is improper; and (3) that Plaintiffs failed to plead a claim to relief under the remaining state antitrust and consumer protection laws.   Plaintiffs have since voluntarily dismissed their Kansas Restraint of Trade Act claim.   (Notice of Dismissal, June 10, 2023, Docket No. 271.)   The Court will take the remaining issues in turn.

### A.     Antitrust Standing

The Supreme Court has two prominent doctrines that impact antitrust standing. In *Illinois Brick Co. v. Illinois*, the Supreme Court held that indirect purchasers were prohibited from seeking damages under federal antitrust law.   *See* 431 U.S. 720 (1977). Then, in *AGC*, the Supreme Court imposed a version of proximate cause on antitrust claims.   459 U.S. at 539 (considering "the directness or indirectness of the asserted injury," including "the chain of causation between the [plaintiff's] injury and the alleged restraint in the market.").   While *Illinois Brick* applies to purchases in the defendants' product distribution chain, *AGC* applies to all potential antitrust plaintiffs—whether they are related to the defendants as purchasers or not.   *Illinois Brick* does not apply here because Plaintiffs are upstream sellers, but *AGC* does.

-8-

The Supreme Court explained in *AGC* that a plaintiff's right to maintain an antitrust action turns on the nature of the alleged injury.  *Id.* at 535.  Being denied the benefits of price competition in the market due to market manipulation is one type of recognized injury.  *Id.* at 535.  The Eighth Circuit has articulated a series of factors to determine if a plaintiff has antitrust standing under *AGC*:

> (1) The causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) Improper motive; (3) Whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) The directness between the injury and the market restraint; (5) The speculative nature of the damages; (6) The risk of duplicate recoveries or complex damage apportionment.

*Midwest Commc'ns v. Minn. Twins, Inc.*, 779 F.2d 444, 450 n.6 (8th Cir. 1985).  This inquiry essentially results in a determination of whether "the plaintiff [is] the target of the anticompetitive activity, not one who has merely suffered indirect, secondary, or remote injury."  *Id.* at 451 (citation and internal quotations omitted).  Despite the multi-factor test, an inquiry into the injury is potentially dispositive because "if there is no showing of injury . . . the plaintiff does not have a claim cognizable under the antitrust laws."  *Id.* at 450.  Injury "that is an integral part of the conspiracy alleged is the type of injury that Congress designed the antitrust laws to prevent."  *Id.* at 451.

### 1.   Antitrust Claims

Plaintiffs bring antitrust claims under the Sherman Act claim and the antitrust laws of 33 states.[4]  The Court must therefore consider whether Plaintiffs have alleged antitrust standing under *AGC.*  Though Plaintiffs summarily assert that *AGC* is satisfied and that the Court should follow its previous analysis of the Indirect Purchaser Plaintiffs' antitrust standing, Plaintiffs here are distinct from the Indirect Purchaser Plaintiffs.  *See In re Cattle Antitrust Litig.*, 2021 WL 7757881, at *11.  Critically, the Indirect Purchaser Plaintiffs alleged that the increased price they paid for beef "is traceable through the product distribution chain, which is adequate both to show that the alleged injury was the direct result of Defendants' alleged anticompetitive conduct . . . and to satisfy the remaining three factors concerning the speculative nature of the harm, the risk of duplicative recovery, and the complexity in apportioning damages."  *Id.*  In contrast, Plaintiffs here have not alleged traceability, which was important to the Court's finding that *ACG* was satisfied.  The Court will therefore not rely on solely its prior analysis and will consider whether Plaintiffs have adequately alleged antitrust standing.

---

[4] Plaintiffs bring antitrust claims on behalf of state law damages classes in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, D.C., Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.  (Compl. at 167–68.)  Of those states, only Alaska, Colorado, Idaho, and Minnesota do not explicitly apply *AGC.*

### a.   Causal Connection

The Court must first consider the "causal connection between the alleged antitrust violation and the harm to the plaintiff." *McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1374 (8th Cir. 1983).  Plaintiffs allege that "Defendants' coordinated conduct, including slashing their respective slaughter volumes and curtailing their buying of fed cattle in the cash cattle market, caused an unprecedented collapse in fed cattle prices in 2015, which led to a parallel collapse of prices of cows and calves." (Compl. ¶ 2.)

While Plaintiffs repeatedly allege that Defendants' conduct caused a collapse in **fed** cow prices, (*E.g., id.* ¶¶ 167, 195.), the causal connection between Defendants' conduct and cow-calf prices is more attenuated.  For instance, Plaintiffs allege that "Defendants . . . conspired to depress fed cattle prices, causing the cow-calf market to decline in turn." (*Id.* ¶ 9.)  But Plaintiffs fail to allege how manipulating the fed cattle prices impacts the cow-calf prices.  Moreover, there is a significant lag between when Plaintiffs sell calves and when Defendants purchase the cattle, which the Court finds weighs against standing in this case.  *See AGC*, 459 U.S. at 545 (finding that the "tenuous and speculative character of the relationship between the alleged antitrust violation and the [Plaintiffs'] injury" weighs against antitrust standing).

Additionally, the Eighth Circuit has held that "[t]o have standing to sue under the antitrust laws, the plaintiff must be the target of anticompetitive activity, not one who has merely suffered indirect, secondary, or remote injury." *Minn. Twins*, 779 F.2d at 451. Plaintiffs state in their Complaint that "[a]s a direct and proximate result of Defendants'

unlawful scheme, Plaintiffs have been harmed in that they were underpaid for their cows, calves, heifers, and steers." (Compl. ¶ 330.) But there is no clear explanation in the Complaint for exactly how Defendants' scheme proximately caused their injury. Rather, Plaintiffs rely on inferences about the market generally, which is insufficient. *See McDonald*, 722 F.2d at 1374 ("Although there may be shown some causal link between the mere presence of a violator in the market and harm caused to a plaintiff, more must be shown.") (internal quotations omitted). This factor therefore weighs heavily against antitrust standing.

### b. Improper Motive

The Court must next consider any improper motive on the part of the Defendants. *McDonald*, 722 F.2d at 1374. The Supreme Court has explained that "an allegation of improper motive, although it may support a plaintiff's damages claim under [antitrust laws], is not a panacea that will enable any complaint to withstand a motion to dismiss." *AGC*, 459 U.S. at 537. Here, Plaintiffs plead that "the conspiracy and the overt acts taking in furtherance of it, were directed at, and had the intended effect of, causing injury to persons" in the United States. (Compl. ¶ 57.) They also state that "Defendants' conspiracy was motivated by profits." (*Id.* ¶ 58.) In another part of their Complaint, Plaintiffs assert that "Defendants reap all the profits from using their collective market power to squeeze both producers and consumers." (*Id.* ¶ 4.) While motivation to increase profits is not inherently improper, this factor weighs in favor of antitrust standing given the broader context of Plaintiffs' price-fixing allegations.

c.      **Type of Injury**

Third, the Court must consider if "the injury was of a type that Congress sought to

redress with antitrust laws." *McDonald*, 722 F.2d at 1374.  The legislative history of the

Sherman Act shows that it "was enacted to assure customers the benefits of price

competition, and [] prior cases have emphasized the central interest in protecting the

economic freedom of participants in the relevant market." *AGC*, 459 U.S. at 538.  A party

can show that they have suffered the type of injury that Congress sought to protect if

their injury is "inextricably intertwined with the injury the conspiracies sought to inflict

on . . . the [relevant] market." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 483

(1982) (finding that a subscriber had standing to sue a health plan for conspiring with

psychiatrists to deny reimbursement for care provided by psychologists because the

subscriber's injury was "inextricably intertwined with the injury the conspirators sought

to inflict on psychologist in the psychotherapy market"); *see also Henke Enterprises, Inc.*

*v. Hy-Vee Food Stores, Inc.*, 749 F.2d 488, 489-90 (8th Cir. 1984) (finding a hardware store

did not have standing to bring an antitrust claim involving the retail grocery store market

because the hardware store's injury was not inextricably intertwined with the retail

grocery store market).

In this case, Plaintiffs allege that they were injured by Defendants' anticompetitive

conduct, that Defendants deprived Plaintiffs of fair price competition at the top of the

supply chain, and that Defendants overcharged consumers at the bottom of the supply

-13-

chain.  (*Id.* ¶¶ 1, 4.)  These allegations highly suggest this is the type of injury Congress

sought to redress.

On the other hand, courts often rule that suppliers like Plaintiffs do not have

antitrust standing because "their injuries are too 'indirect, secondary, or remote.'"  *E.g.,*

*Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Plan. Ass'n*, 830 F.2d 1374, 1379 (7th Cir.

1987).  There are multiple stages in the beef supply chain between Plaintiffs and

Defendants, and the calves that Plaintiffs raise are inherently different than the full-grown

cattle that Defendants process.  Years may pass between when Plaintiffs sell the cows and

when Defendants purchase them.  Thus, Plaintiffs' alleged injury is inherently remote.

Further, Plaintiffs also have not alleged that their injury is "inextricably

intertwined" with the relevant market.  *See McCready*, 457 U.S. at 483.  The Court

previously found that Producer Plaintiffs demonstrated that the prices paid for fed cattle

were inextricably intertwined with live future cattle prices.  *In re Cattle Antitrust Litig.*,

2021 WL 7757881, at *8.  But Producer Plaintiffs thoroughly alleged that the prices were

inextricably linked.  (*See, e.g.*, No. 19-1222, 3rd Am. Compl. ¶¶ 341, 381, 382, 389, Dec.

28, 2020, Docket No. 312.)  Plaintiffs here have not.

Balancing these arguments, the Court finds that this factor is neutral and does not

necessarily weigh in favor or against standing.

### d.   Directness

The fourth factor the Court considers is the directness between the injury and the

market restraint.  *McDonald*, 722 F.2d at 1374.  This requires consideration of the "chain

of causation." *AGC*, 459 U.S. at 540.  *See also Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.*, 951 F.2d 1158, 1162 (9th Cir. 1009) ("[D]irectness in the antitrust context means close in the chain of causation.")  Plaintiffs are several steps removed from Defendants' alleged market manipulation, which highly disfavors antitrust standing.

Defendants point to *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1091 (N.D. Cal. 2007).  In *DRAM*, the Northern District of California considered whether indirect purchasers of DRAM from defendants had standing for their antitrust claims.  The court explained that it "must simply consider whether, as indirect purchasers, there is a direct link in the causation chain between defendants' alleged conspiracy to restrain prices, and the artificially high prices paid by plaintiffs who purchased products in which DRAM is a component." *Id.*  The court considered the nature of the product and concluded that "plaintiffs' complaint sets forth no allegations that demonstrate that, within the final purchase price of a given product purchased by plaintiffs for 'end use,' the ultimate cost of the DRAM component is somehow directly traceable and/or distinguishable." *Id.* at 1092.  Accordingly, the directness was "too remote to warrant tipping this favor in favor of standing." *Id.*

Here too, Plaintiffs have not explained how their decreased profits are traceable to the Defendants' conduct.  They rely on inferences about the market, unsupported by sufficient factual allegations.  This factor therefore weighs against antitrust standing.

### e.      Speculative Nature of Damages

The fifth factor the Court considers is the speculative nature of damages. *McDonald*, 722 F.2d at 1374.  Defendants argue that the Plaintiffs lack antitrust standing because their damages are too speculative given that there are many supply and demand factors that affect cow-calf prices.  However, similar meat packing antitrust cases have considered the speculative nature of damages and acknowledged that there are means and methods for economic analysists to pinpoint prices that would have been paid but for the conspiracy.  For instance, regression analysis is a generally accepted econometric method to determine causation and damages in the antitrust context, and it gives the analyst the ability to narrow down various supply and demand factors to pinpoint the damages exclusively caused by market manipulation.  *See In re Pork Antitrust Litig.*, No. 18-1776, 2023 WL 2696497, at *10–11 (D. Minn. Mar. 29, 2023.)  This factor is therefore neutral and does not necessarily weigh against standing.

### f.      Risk of Duplicative Recovery

Lastly, the Court should consider the "risk of duplicative recoveries or complex damage apportionment."  *McDonald*, 722 F.2d at 1343.  The risk of complex apportionment "refers to the difficulty in ascertaining what portion of an overcharge was passed on from direct purchasers to downstream links in a distribution chain, such as indirect purchasers."  *In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-2420, 2014 WL 4955377, at *15 (N.D. Cal. Oct. 2, 2014).  The Court is unconvinced that it would be

difficult for the parties to conduct economic analysis to ascertain an appropriate damages amount.  This factor therefore weighs in favor of standing.

However, weighing all six factors, the Court finds that Plaintiffs failed to establish antitrust standing under *AGC.*  They did not plausibly allege a causal relationship between Defendants' conduct and their injury, or that their injury and damages are in fact traceable to Defendants' actions.  Plaintiffs instead rely on inferences based upon the Court's prior analysis for Class Plaintiffs, which is not informative here given the more attenuated connection between Plaintiffs raising calves and Defendants processing and packing beef.

Because Plaintiffs have not established antitrust standing, the Court will dismiss Plaintiffs' Sherman Act claim and state antitrust law claims in the states that apply *AGC.*[5]

_____

[5] These states are Alabama, Arizona, Arkansas, California, Connecticut, the District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. *See In re Dealer Mgmt. Sys. Antitrust Litig.,* 362 F. Supp. 3d 510, 541–545 (N.D. Ill. 2019) (holding Alabama, Arizona, Hawaii, Mississippi, New Hampshire, Oregon, Rhode Island, Tennessee, Utah, West Virginia, District of Columbia, Iowa, California, Kansas, Michigan, New York, North Carolina, Maine, Nebraska, New Mexico, South Dakota, Vermont, and Wisconsin would apply *AGC* to their state antitrust claims); *Oliver v. Am. Express Co.,* No. 19-0566, 2021 WL 386749, at *2–3 (E.D.N.Y. Feb. 1, 2021) (holding Illinois and Maryland would apply *AGC*); *Nevada Recycling & Salvage, Ltd. v. Reno Disposal Co., Inc.,* 134 Nev. 463, 466 (2018) (applying *AGC* in Nevada); *Beckler v. Visa U.S.A., Inc.,* No. 09-04-0030, 2004 WL 2475100, at *4 (D.N.D. Sept. 21, 2004) (applying *AGC* in North Dakota); *GEICO Corp. v. Autoliv, Inc.,* 345 F. Supp. 3d 799, 845–46 (E.D. Mich. 2018) (applying *AGC* to Arkansas claims).  Connecticut would also apply *AGC* because its statutes and cases indicate intent to harmonize with federal antitrust law, which is sufficient basis to conclude that Connecticut would apply *AGC.*  *See Vacco v. Microsoft Corp.,* 793 A.2d 1048, 1064 (Conn. 2002) (noting that the "legislature has expressed the intent that Connecticut's antitrust law be interpreted harmoniously with federal antitrust law"); *Dealer Mgmt.*, 362 F. Supp. 3d at 545

The Court will also dismiss the antitrust claim arising under Minnesota law because, though Minnesota does not apply *AGC* explicitly, it similarly considers proximate causation and directness, which Plaintiffs failed to establish. *See Lorix v. Crompton Corp*., 736 N.W.2d 619, 631 (Minn. 2007) ("Standing under Minnesota antitrust law must be defined by some prudential limits informed by foreseeability, proximate cause, remoteness, and relation of the injury to the purposes of the antitrust law.").

### 2.    Packers and Stockyards Act Claims

Next, the parties dispute whether Plaintiffs must also establish *AGC* standing to maintain their Packers and Stockyards Act ("PSA") claim.  *AGC* pertained to antitrust claims arising under the Clayton Act.  *See* 459 U.S. at 521.  The Supreme Court in *AGC* observed that "the lower federal courts have been 'virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced an antitrust violation.'"  *Id.* at 534 (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.14 (1972)).  The Court therefore found that it needed to "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Id.* at 535.  There is no language in *AGC* that indicates it was intended to be limited to the Clayton Act.

---

(holding that existence of a harmonization provision, without any countervailing cases or statutes, is sufficient to determine *AGC* would apply).

The Supreme Court and the Eighth Circuit have since applied *AGC* outside of the Clayton Act context.  *See, e.g., State of S.D. v. Kan. City S. Indus., Inc.*, 880 F.2d 40, 46 (8th Cir. 1989) (applying *AGC* to Sherman Act and "federal antitrust" claims); *In re Monosodium Glutamate Antitrust Litig.*, 477 F.3d 535, 538–39 (8th Cir. 2007) (applying *AGC* to the Foreign Trade Antitrust Improvements Act of 1982); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 267 (1992) (applying *AGC* to the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO") because it was modeled after federal antitrust laws like the Clayton Act and Sherman Act).  A common theme among these cases is that courts apply *AGC* to laws that reflect federal antitrust statutes.

Though courts have not yet applied *AGC* to PSA claims, it seems logical to do so here because the PSA's purpose and language mirror federal antitrust laws.  "[T]he 'chief evil' at which [the PSA] was aimed was 'the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper who sells, and unduly and arbitrarily to increase the price to the consumer who buys.'"  *Mahan v. Stowers*, 416 U.S. 100, 106 (1974) (quoting *Stafford v. Wallace*, 258 U.S. 495, 514–15 (1992)).  The Eighth Circuit has acknowledged that the PSA "has its origins in antecedent antitrust legislation and primarily prevents conduct which injures competition."  *Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1460 (8th Cir. 1995) (applying the Sherman Act's statute of limitations to the PSA because the PSA does not have a statute of limitations).  The Ninth Circuit has also explained that the PSA "incorporates the basic antitrust blueprint of the Sherman Act and

other pre-existing antitrust legislation." *De Jong Packing Co. v. U.S. Dep't of Agriculture*, 618 F.2d 1329, 1335 n.7 (9th Cir. 1980).

Moreover, the PSA and the Sherman Act share many of the same underlying principles. The PSA makes it unlawful for packers to "[e]ngage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of buying, selling, or dealing in, any article, or of restraining commerce." 7 U.S.C. § 192(e). The goal is to "assure fair trade practices in the livestock marketing and meat-packing industry in order to safeguard farmers and ranchers against receiving less than the true market value of their livestock and to protect consumers against unfair business practices in the marketing of meats." *Bruhn's Freezer Meats of Chicago, Inc. v. U.S. Dept. of Agriculture*, 438 F.2d 1332, 1337–38 (8th Cir. 1971) (quotation omitted). At its heart, the PSA is an antitrust law. The principles that govern antitrust laws should therefore apply to the PSA—including the standing analysis from *AGC.*

The Court thus finds that plaintiffs must establish *AGC* antitrust standing to sustain claims under the Packers and Stockyards Act. Because Plaintiffs here have not done so, their PSA claim will be dismissed.

### 3.   State Consumer Protection Claims

Finally, the parties dispute whether Plaintiffs must also establish antitrust standing for their state consumer protection law claims. Plaintiffs bring state consumer protection

claims on behalf of state law damages classes in 32 states.[6]   Other courts have applied

*AGC* to state consumer protection laws.   *See e.g., In re Dynamic Random Access Memory*

*(DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1142 (N.D. Cal. 2008) ("Defendants are

correct in observing that case law from both Nebraska and New York indicate that

standing for claims under their state consumer protection statutes, where the claims are

based on antitrust violations, should be assessed with reference to *AGC* factors."); *GEICO*

*Corporation v. Autoliv, Inc.*, 345 F. Supp. 3d 799, 845–46 (E.D. Mich. 2018) ("Defendants

argue, and GEICO does not dispute, that the courts have engaged in a similar 'remoteness'

inquiry, either with or without specific reference to the *AGC* factors, in determining

whether a plaintiff may pursue a claim under the consumer protection laws of Arkansas,

New York or Vermont.").

Here, Plaintiffs' consumer protection law claims are largely based on

anticompetitive conduct.   The Court will therefore apply *AGC* to the consumer protection

---

[6] Plaintiffs bring state consumer protection law claims in Alaska, Arizona, Arkansas, California, Colorado, Connecticut, D.C., Florida, Hawaii, Idaho, Illinois, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. (Compl. at 170–71.)  They concede to dismissal of their consumer protection claims arising under the laws of Alaska, Arkansas, Connecticut, D.C., Hawaii, Idaho, Maine, Massachusetts, Missouri, Nebraska, New Hampshire, and Rhode Island.  (Mem. Opp. Mot. Dismiss at 22–33.)

claims arising under state law where the state employs *AGC* in the antitrust context.[7]   The

Court will dismiss those state law claims for lack of standing.

### B.      Remaining State Law Claims

Defendants ask the Court to dismiss many of Plaintiffs' remaining state law claims

for failure to state a claim upon which relief may be granted.   Plaintiffs agree that

dismissal of many of these claims is appropriate.[8]   The Court will dismiss the remaining

claims as outlined below.

### 1.   Colorado

Though Plaintiffs consent to dismissal of their claim under the Colorado Antitrust

Act, they argue their Colorado Consumer Protection Act claim should proceed.   The

Colorado Consumer Protection Act allows "a civil action for any claim against any person

who has engaged in or caused another to engage in any deceptive trade practice" in the

course of their business.   Colo. Rev. Stat. § 6-1-113(1).   The Colorado Supreme Court has

held that "the plaintiff must be able to show that the defendant's actions in violation of

---

[7] Accounting for the consumer protection claims that Plaintiffs have conceded already, these states are Arizona, California, Illinois, Kansas, Michigan, Nevada, New Mexico, New York, North Carolina, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

[8] Plaintiffs concede that dismissal is appropriate for their antitrust claims under Alaska, Colorado, and Idaho state law.   As to their consumer protection claims, Plaintiffs agree to dismiss their claims arising under the laws of Alaska, Arkansas, Connecticut, the District of Columbia, Hawaii, Idaho, Maine, Massachusetts, Missouri, Nebraska, New Hampshire, and Rhode Island. (Mem. Opp. Mot. Dismiss at 22–33.)

the [Colorado Consumer Protection Act] **caused** the plaintiff's injury." *Hall v. Walter*, 969

P.2d 224, 235 (Colo. 1998) (emphasis added).

Plaintiffs allege that Defendants made misrepresentations.  (Compl. ¶ 303.)  But

even assuming that Defendants' alleged conduct would be prohibited under the Colorado

Consumer Protection Act, Plaintiffs have not alleged that they were injured by those

misrepresentations specifically.  Rather, their alleged injury stems from the Defendants'

alleged conspiracy and price-fixing.  The Court will therefore dismiss this claim.

### 2.  Florida

Plaintiffs bring a consumer protection claim under the Florida Deceptive and Unfair

Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, et seq.  The FDUTPA makes it

unlawful to engage in unfair methods of competition.  Fla. Stat. § 501.204(1).  The FDUTPA

provides that "a person who has suffered a loss **as a result of** a violation" of the FDUTPA

may bring an action for damages.  Fla. Stat. Ann. § 501.211(2) (emphasis added).  As

discussed above, Plaintiffs have not sufficiently pled that their alleged injuries were

proximately caused by Defendants' conduct.  Accordingly, Plaintiffs have failed to state a

claim to relief under the FDUTPA and this claim will be dismissed.

### 3.  Kansas

Though the Kansas consumer protection claim will be dismissed for lack of standing

under *AGC*, it will also be dismissed with prejudice on the merits.  Plaintiffs brought a

claim under the Kansas Consumer Protection Act, which defines "consumer" to mean "an

individual . . . who seeks or acquires property or services for personal, family, household,

business or agricultural purposes." Kan. Stat. Ann. § 50-624(b). Plaintiffs argue that this definition includes farmers who seek services for an agricultural purpose. However, Plaintiffs misread the plain language of the statute. *See Wright v. Enhanced Recovery Co., LLC*, 227 F. Supp. 3d 1207, 1211 (D. Kan. 2016) ("In order to maintain an action under the KCPA, [plaintiff] must have been a consumer with respect to his dealings with [defendant]."). Plaintiffs have not alleged that they contracted for any services from Defendants or otherwise were consumers of the Defendants' products. Thus, they are not "consumers" for the purpose of the Kansas Consumer Protection Act and this claim will therefore be dismissed with prejudice.

### 4. Michigan

The Court will also dismiss the Michigan consumer protection claim both for lack of *AGC* standing and on the merits. Plaintiffs bring claims under the Michigan Consumer Protection Act, Mich. Compl. Laws. §§ 445.901, et seq. The Michigan Consumer Protection Act is limited to claims relating to purchases "primarily for personal, family, or household purposes." Mich. Comp. Laws Ann. § 4455.902(g). Since Plaintiffs represent sellers of calves not for personal use, the statute does not apply to them. The claim will therefore be dismissed with prejudice.

### 5. Minnesota

The Eighth Circuit has explained that the Minnesota Consumer Fraud Act does not apply to sellers' claims. *Popp Telecom, Inc. v. Am. Sharecom, Inc.*, 361 F.3d 482, 493, 493 n.12 (8th Cir. 2004). Since Plaintiffs are sellers of cow-calves, they are thus unable to

recover under the Minnesota Consumer Fraud Act and the Court will dismiss their Minnesota consumer protection claim with prejudice.

### 6. Montana

Plaintiffs also assert a consumer protection claim under the Montana Consumer Protection Act, Mont. Code Ann. §§ 30-14-103, et seq.   The Montana Consumer Protection Act provides that a consumer may bring an individual action if they suffer an ascertainable loss of money or property "as a result of" another person's unlawful practices.  Mont. Code. Ann. § 30-14-133.  Not only have Plaintiffs not adequately alleged that Defendants' conduct proximately caused their injury, but the Montana Consumer Protection Act also explicitly states that consumers may bring an individual action "but not a class action" to recover damages.  *Id.*  Plaintiffs attempt to bring an impermissible class action under the Montana Consumer Protection Act, so this claim will be dismissed with prejudice.

### 7. Oregon

Though the Court will dismiss the Oregon consumer protection claim for lack of standing under *AGC*, it will also consider the merits.  Plaintiffs bring a claim under the Oregon Unlawful Trade Practices Act ("OUTPA"), Or. Rev. Stat. §§ 646.605, et seq.  This statute prohibits certain unlawful trade practices, including "employ[ing] any unconscionable tactic in connection with selling . . . goods." Or. Rev. Stat. § 646.607.  The statute also provides an enumerated list of unlawful trade practices, which does not include price fixing.   *See* Or. Rev. Stat. § 646.608.   Courts have construed

-25-

"unconscionable" in this context to require allegations involving false and misleading representations made by defendants to plaintiffs. *See e.g., In re Packaged Seafoods Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1084–85 (S.D. Cal. 2017).

Plaintiffs assert that they alleged fraudulent concealment of the alleged conspiracy. (*See* Compl. ¶ 303.)  However, to sustain a claim under the OUTPA, a plaintiff must allege that (1) the defendant committed an unlawful trade practice; (2) plaintiff suffered an ascertainable loss of money or property; and (3) plaintiff's injury was the result of the unlawful trade practice. *Pearson v. Philip Morris, Inc.*, 358 Or. 88, 361 P.3d 3, 28 (2015).  Plaintiffs here have not sufficiently alleged that they were injured because of Defendants' false and misleading representations specifically.  This claim will therefore also be dismissed on the merits.

### 8.  South Dakota

Plaintiffs bring a consumer protection claim under the South Dakota Deceptive Trade Practices Act, S.D. Cod. § 37-24-6(1).  However, this law seemingly only provides a cause of action for buyers, not sellers.  *See id.* (declaring it illegal to misrepresent information "in connection with the sale" of goods).  Moreover, to recover under the South Dakota Deceptive Trade Practices Act, South Dakota courts have required plaintiffs to actually rely on defendants' misrepresentations.  *See Rainbow Play Sys., Inc. v. Backyard Adventure, Inc*., No. 06-4166, 2009 WL 3150984, at *7 (D.S.D. Sept. 28, 2009). Because Plaintiffs are sellers, because they have not alleged that they relied on false

statements, and because they have not established standing for this claim under *AGC*, the Court will dismiss Plaintiffs' South Dakota consumer protection claim with prejudice.

### 9. Utah

Plaintiffs' Utah consumer protection claim will be dismissed under *AGC* but will also be considered on the merits for the sake of completeness.  Plaintiffs bring a cause of action under Utah's Consumer Sales Practice Act ("UCSPA").  The Court has explained that antitrust violations may be considered unconscionable acts that violate the UCSPA.  *In re Cattle Antitrust Litig.*, 2021 WL 7757881, at *14.  However, the UCSPA expressly limits causes of action to those against "suppliers."  *See e.g.*, Utah Code Ann. § 13-11-4 ("Deceptive act or practice by supplier").  "Supplier" is defined as a "seller, lessor, assignor, offeror, broker, or other person who regularly solicits, engages in, or enforces consumer transactions, whether or not he deals directly with the consumer."  Utah Code Ann. § 13-11-3(6).

Defendants arguably qualify as suppliers because they are in the business of selling processed beef.  However, a plaintiff can only pursue a claim if the supplier committed a deceptive or unconscionable act "in connection with a consumer transaction."  Utah Code. Ann. §§ 13-11-5(1), 13-11-4(1).  In other words, the statute is designed for consumers to bring a cause of action against their supplier.  Utah Code Ann. § 13-11-19(1).  Though Defendants may qualify as suppliers, Plaintiffs are not Defendants' consumers.  This claim will therefore be dismissed with prejudice.

-27-

### 10. Vermont

Though already dismissed for lack of *AGC* standing, the Court will consider the merits of Plaintiffs' Vermont consumer protection law claim.  Plaintiffs bring a claim pursuant to the Vermont Consumer Protection Act, which encompasses both consumer protection and antitrust law issues.  *See* Vt. Stat. Ann. Tit. 9, § 2453.  The statute says that "any consumer who contracts for goods or services in reliance upon false or fraudulent representations or practices" may bring a cause of action.  Vt. Stat. Ann. Tit. 9, § 2461(b). *See also Messier v. Bushman*, 208 Vt. 261, 272 (Vt. 2018) ("In order to recover under the CPA, a plaintiff must establish that they are a consumer.").  Consumers are limited to those who purchase, lease, or contract for goods or services for his or her use or benefit or the use or benefit of a member of his or her household.  Vt. Stat. Ann. Tit. 9, § 2451a(a). Not only are Plaintiffs not consumers, but they also have not alleged any facts that suggests they relied upon Defendants' misrepresentations.  The Court will therefore dismiss Plaintiffs' claims arising under Vermont state law with prejudice.

### 11. West Virginia

Likewise, the Court will also consider Plaintiffs' West Virginia claim on the merits. Plaintiffs bring a claim under the West Virginia Consumer Credit and Protection Act ("WVCCPA").  The WVCCPA provides a cause of action for "any person who purchases or leases goods or services" and suffers a loss as a result of a prohibited practice.  W. Va. Code § 46A-6-106.  Though this language does not limit causes of action to only consumer plaintiffs, it makes clear that individuals only have a cause of action if they purchase or

lease goods.  Since Plaintiffs are sellers in this context—not purchasers or lessees— they do not have a cause of action under WVCCPA.  This claim will thus dismissed with prejudice.

### C.      Leave to Amend

Finally, Plaintiffs haphazardly ask the Court to grant them leave to amend their complaint in the event that the Court finds dismissal of their claims is proper.  Federal Rule of Civil Procedure 15(a) provides that a party may amend its pleading only with the opposing party's written consent or the court's leave, and that the court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, plaintiffs do not have an "absolute or automatic" right to amend.  *U.S. ex rel. Lee v. Fairview Health Sys.*, 413 F.3d 748, 749 (8th Cir. 2005).  Futility is a valid basis for denying leave to amend.  *Moses.com Securities, Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065 (8th Cir. 2005).  The Eighth Circuit has explained that "parties should not be allowed to amend their complaint without showing how the complaint could be amended to save the meritless claim."  *Windsom v. First Midwest Bank*, 167 F.3d 402, 409 (8th Cir. 1999).

Here, Plaintiffs have not shown how they would amend their complaint to establish antitrust standing or otherwise overcome the deficiencies in their first pleading.  The Court therefore declines to grant them leave to amend at this time.  Plaintiffs may file a letter with the Court within 15 days of the date of this order that establishes how they will overcome the deficiencies the Court has described, which the Court will then consider and determine whether leave to amend is warranted.

-29-

**CONCLUSION**

The Court will dismiss Plaintiffs' Sherman Act, Packers and Stockyards Act, and many of Plaintiffs' state antitrust and consumer protection law claims for lack of antitrust standing under *AGC.*  The Court will also dismiss the remaining state law claims for the various reasons outlined above.  Because the Plaintiffs have not shown how they intend to amend their pleadings to overcome the deficiencies, the Court declines to grant them leave to amend at this time.  Plaintiffs may file a letter with the Court that outlines the basis for amending their complaint, which the Court will then consider and issue a decision on the request for leave to amend.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss [No. 22-3031, Docket No. 140] is **GRANTED as follows:**

1.   Plaintiffs' Sherman Act and Packers and Stockyards Act claims are dismissed without prejudice;

2.  Plaintiffs' antitrust claims arising under the laws of Alabama, Arizona, Arkansas, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon,

Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin are dismissed without prejudice;

3. Plaintiffs' antitrust claims arising under the laws of Alaska, Colorado, and Idaho are dismissed with prejudice;

4. Plaintiffs' consumer protection claims arising under the laws of Arizona, California, Colorado, Florida, Illinois, Nevada, New Mexico, New York, North Carolina, Oregon, Tennessee, and Wisconsin are dismissed without prejudice;

5. Plaintiffs' consumer protection claims arising under the laws of Alaska, Arkansas, Connecticut, District of Columbia, Hawaii, Idaho, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, New Hampshire, Rhode Island, South Dakota, Utah, Vermont, and West Virginia are dismissed with prejudice; and

6. Plaintiffs may file a letter with the Court within fifteen days that demonstrates leave to amend the pleadings is warranted, which the Court will then consider.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED: August 17, 2023
at Minneapolis, Minnesota.                    _____
                                                        JOHN R. TUNHEIM
                                               United States District Judge